UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )
                                   )    CRIMINAL ACTION NO.
v.                                 )    08-10317-DPW
                                   )
CHAN HOK SHEK a/k/a JOHN CHAN,     )
                                   )
        Defendant.                 )

MEMORANDUM AND ORDER
November 10, 2010

Chan Hok Shek, also known as John Chan, has been charged
with conspiracy, attempted unlawful export of items listed on the
United States Munitions List, and smuggling.  Chan has moved to
suppress a pretrial, out-of-court identification of him and
statements by him and by his employees made to U.S. agents during
two visits to Chan's Hong Kong office.  He has also filed a
motion for defense witness immunity.  For the following reasons,
I will deny both motions to suppress evidence and Chan's motion
for immunity.

**I.**

On October 23, 2008, a grand jury indicted Chan on five
counts related to an alleged scheme to export military aircraft
training parts from the United States: conspiracy to export items
on the United States Munitions List without the required license
or authorization, in violation of 18 U.S.C. § 371 (Count One);
attempt to export items designated on the United States Munitions
List without the required license or authorization, in violation

of 22 U.S.C. §§ 2778(b)(2) and 2778(c), 22 C.F.R. §§ 121.1,

123.1, and 127.1(a)(1), and 18 U.S.C. § 2 (Count Two); attempt to

smuggle merchandise from the United States, in violation of 18

U.S.C. §§ 554 and 2 (Count Three); and money laundering, in

violation of 18 U.S.C. § 1956(a)(2)(A) and 2 (Counts Four and

Five).  In March 2008, Chan was arrested in Hong Kong and

extradited to the United States under an extradition agreement

permitting prosecution solely on the unlawful export, conspiracy,

and smuggling charges.

According to the indictment, Chan, through two associates

located in Malaysia,[1] contracted with Desmond Dinesh Frank to

arrange the purchase and export to Malaysia of certain aircraft

indicators listed on the United States Munitions List without the

required license and documentation.

**A.   Frank's Pretrial Identification of Chan**

Frank states that before placing the order for the parts in

October 2006, he met with Chan in Malaysia to confirm the details

of the order.  Frank maintains that he also met with Chan in

Chan's offices in Hong Kong in November 2006 and in Malaysia in

the spring of 2007.  (Frank Aff. ¶¶ 8, 11.)[2]

In October 2007, Frank was arrested in Hawaii after

---

[1] These two men have been indicted, but, as of yet, the
government has been unable to secure their extradition to the
United States for prosecution.

[2] Chan appears to concede, for purposes of the motion to
suppress the pretrial identification, that he met with Frank
three times.  (Def.'s Memo. (Photo Array) at 4 (DE 25).)

completing arrangements for the shipment of the parts to Chan's associates in Malaysia.  (Frank Aff. ¶ 16.)  The warrant for Frank's arrest indicated that he was charged with conspiracy to unlawfully export defense articles with an as-yet-unknown individual.  (Goldsworthy Aff. ¶ 4.)  Shortly after his arrest, Frank named John Chan as his Hong Kong client and co-conspirator. (Goldsworthy Aff. ¶¶ 4-5.)

On May 13, 2008, Special Agent Brian Goldsworthy of United States Customs and Immigration Enforcement ("USICE") presented Frank with a photo array containing six photographs, including those of Chan and five other Asian males of a similar age. (Goldsworthy Aff. at ¶ 6.)  Frank immediately identified Chan's photograph as that of the man who had ordered the aircraft parts and with whom Frank had met in Hong Kong and Malaysia. (Goldsworthy Aff. ¶ 7.)  Frank was not shown any individual photograph of Chan before identifying him in the photo array. (Goldsworthy Aff. ¶ 8.)  On May 18, 2009, several days after identifying Chan in the photo array, Frank executed an affidavit in support of the government's request for extradition of Chan. An individual photograph of Chan was attached as the only exhibit to that affidavit.  (Frank Aff., Ex. 1.)

**B.   The 2003 Visits to Chan's Hong Kong Offices**

On October 20, 2003, three U.S. agents visited the Hong Kong office of Chan's company, Jetpower Industrial, Ltd. ("Jetpower"). (Chan Aff. ¶ 4.)  Two of the men, John Sonderman and Earl

Estrada, had traveled to Hong Kong to conduct a number of post-shipment and end-user verifications for exports shipped from the United States.  (Sonderman Aff. ¶¶ 1, 5.)  At that time, Sonderman was Unit Chief for the Operations Division of the Office of Export Enforcement ("OEE") at the Department of Commerce's Bureau of Industry and Security and, as such, conducted investigations into violations of unlawful exports of restricted goods. (Sonderman Aff. ¶¶ 1-2.)  Estrada was a former OEE special agent.  (Sonderman Aff. ¶ 5.)  Upon prompting by OEE's New York field office, Sonderman included Jetpower and Chan on a list of approximately seventy verification interviews for the Hong Kong trip.  (Sonderman Aff. ¶ 6.)  A U.S. consular official, Dien Ly, accompanied Sonderman and Estrada on the October 20, 2003, visit to Jetpower.  (Sonderman Aff. ¶ 8.)

In anticipation of Sonderman's visit to Jetpower, U.S. consular officials in Hong Kong contacted Jetpower by phone and by fax in an attempt to make an appointment.  (Sonderman Aff. ¶ 7.)  Because no one from Jetpower would confirm a meeting time, the three men arrived at Jetpower without an appointment. (Sonderman Aff. ¶ 7.)  Upon arrival at Jetpower, Sonderman and his colleagues, who were unarmed and dressed in civilian clothing, entered the reception area and identified themselves to the receptionist as individuals from the U.S. Consulate. (Sonderman Aff. ¶¶ 9-10; Chan Aff. ¶ 4-5.)  Chan, who followed the men into the reception area, was surprised by the visit but

introduced himself.  (Chan Aff. ¶ 4.)  Sonderman explained the
nature of the visit as a post-shipment verification and gave Chan
a business card that identified him as an employee of the U.S.
Department of Commerce.  (Sonderman Aff. ¶¶ 9, 11.)  Chan led the
men into a conference room.  (Chan Aff. ¶ 8.)  As Chan led the
men to the conference room, Sonderman noticed Iranian procurement
documents lying on several desks and became concerned about the
ultimate end users of the exported aircraft parts that Chan had
procured.  (Sonderman Aff. ¶ 12.)

Once Sonderman, Estrada, and Ly were seated at the
conference table, Chan closed the door of the room, and the
interview continued for approximately thirty minutes.  (Sonderman
Aff. ¶ 13.)  Sonderman asked Chan questions regarding Jetpower
and businesses using Jetpower's business address.  (Sonderman
Aff. ¶ 15.)  Chan explained that Jetpower dealt in spare aircraft
parts but had recently become more active in the food industry.
(Sonderman Aff. ¶¶ 15, 17.)  Chan stated that the shift away from
aircraft parts followed a 1993 incident in which he had to pay a
fine because he was "caught" by Hong Kong customs agents,
although he claimed that he did not know that the transactions in
question involved sensitive items.  (Sonderman Aff. ¶ 16.)  Chan
stated that he sold aircraft parts to companies in Malaysia,
Australia, and Singapore, but declined to identify the end users.
(Sonderman Aff. ¶ 17.)  Chan also admitted — after initially

denying — that he let "friends" use Jetpower's business address and that he allowed these "friends" to use his bank accounts to transact business.  (Sonderman Aff. ¶ 19.)  Sonderman showed Chan a number of documents regarding purchases of aircraft parts by three businesses using Jetpower's business address, but Chan denied knowledge of any of the transactions, including a Jetpower transaction for $132,000.  (Sonderman Aff. ¶¶ 19-20.)  Chan did admit that he owned one of the three businesses but stated that he had cancelled the registration for that company.  (Sonderman Aff. ¶ 19.)  Chan denied remembering any transactions with a number of U.S. exporters and stated that he did not deal with U.S. companies because of his experience with Hong Kong customs in 1993.  (Sonderman Aff. ¶ 19.)

Chan ended the interview by telling Sonderman and the others that he would look into their questions and provide follow-up information at a later date.  (Chan Aff. ¶ 11.)  Chan made an appointment with the agents for October 29, 2003, at which point, he assured them, he would provide further information.  (Chan Aff. ¶ 11; Sonderman Aff. ¶ 21.)  During the interview, Chan sat closest to the door, answered some of the agents' questions, and declined to answer others.  (Sonderman Aff. ¶ 13.)

On October 29, 2003, when Sonderman, Estrada, and Ly returned to Jetpower's office, Chan was not present.  (Chan Aff. ¶ 12; Sonderman ¶ 22.)  Chan maintains that he "decided not to

come to work on that day because [he] feared for [his] safety."
(Chan Aff. ¶ 12.)  Chan's secretary told the agents that Chan had
left on an emergency trip and was unreachable.  (Sonderman Aff.
¶ 22.)  The secretary told the agents that she had seen requests
for quotes from Iran and that Chan had traveled to Iran.
(Sonderman Aff. ¶ 22.)  A receptionist informed the agents that
Chan had done business in Malaysia.  (Sonderman Aff. ¶ 22.)

## II. MOTION TO SUPPRESS PRETRIAL IDENTIFICATION

Chan seeks to suppress evidence of Frank's identification of
Chan and the individual photograph of Chan attached to Frank's
affidavit in support of Chan's extradition.  He argues that the
photo array was impermissibly suggestive and that Frank's
identification was unreliable.

The exclusion of a pretrial identification from a photo
array is appropriate "only in those extraordinary cases where
there is a very substantial likelihood of irreparable
misidentification, a situation which could result in an unfair
trial in violation of the defendant's due process rights."
*United States v. DeCologero*, 530 F.3d 36, 61 (1st Cir. 2008)
(citations and internal quotation marks omitted).  "Short of that
point, such evidence is for the jury to weigh . . ., for evidence
with some element of untrustworthiness is customary grist for the
jury mill."  *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

The First Circuit has outlined a two-step analysis governing admissibility of pretrial identifications, according to which I must "first determine whether the identification procedure was impermissibly suggestive, and if it was, . . . then look to the totality of the circumstances to decide whether the identification was still reliable." *DeCologero*, 530 F.3d at 62 (citations omitted).  The first determination itself includes "two constituent parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *United States v. Holliday*, 457 F.3d 121, 125 (1st Cir. 2006) (citation and internal quotation marks omitted).  In selecting the photographs for the array, officers must have "included, as far as was practicable, a reasonable number of persons similar in appearance to the suspect." *DeCologero*, 530 F.3d at 62 (citation omitted).  However, in doing so, "[t]he police are not required to search for identical twins." *Holliday*, 457 F.3d at 126 n.5 (citation and quotation marks omitted).

Chan first argues that the photo array was impermissibly suggestive because there is no evidence that the officers showed Frank the photo array before showing him the individual photograph of Chan that was attached to Frank's affidavit.  I find this assertion unsupported and unconvincing.  In an affidavit, Goldsworthy states that no such photograph was shown

8

to Frank prior to his identification of Chan and, furthermore, Frank's affidavit was dated five days after the initial identification took place.  (Goldsworthy Aff. ¶ 8; Frank Aff. at 7.)  Moreover, Chan presents no evidence that anyone showed Frank the individual photograph before showing him the photo array. Absent some evidence beyond unsupported speculation that Frank was exposed to an individual photograph of Chan prior to viewing the photo array, the fact that an individual photograph of Chan was attached to Frank's extradition affidavit several days later does not alone render the photo-array identification impermissibly suggestive.

Chan next argues that the photo array was impermissibly suggestive because it unfairly drew attention to Chan's photograph.  Specifically, Chan submits that the face coloration was noticeably different in his photograph; that most of the men were significantly younger than Chan; that Chan was the only man with white or gray hair; that most of the men were dressed differently than him; and that only one other man was wearing eyeglasses.

After reviewing the original photo array, I find these claims are unfounded.  First, four of the men, including Chan, are wearing eyeglasses.  Second, although Chan is not wearing a suit, he is similarly attired in a dress shirt and his photograph is cropped in such a way that it is difficult to tell whether he

is wearing a tie or a jacket.  In any case, Frank's personal
knowledge of Chan's appearance was in no way tied to a specific
description of his clothing.  *See, e.g.*, *United States v.
Brennick*, 405 F.3d 96, 100 (1st Cir. 2005) ("As none of the
witnesses described Brennick as wearing a zippered mock
turtleneck and the other men pictured in the array are not
uniformly dressed in a manner that makes Brennick stand out, it
is irrelevant that he is the only one pictured wearing one.").
Chan likewise does not stick out because of his age.  Although
one man appears to be younger than the rest, the other four men
appear to be of a similar age to Chan.  As to hair color, it is
not clear from the photo array that none of the other men have
gray or white hair.  The photo array is faint and in black and
white, making identification of hair color difficult.  It appears
at least one other photograph (photograph 6) depicts a man with
gray or graying hair and that photographs 1 and 3 are
indeterminate.  Any difference in the quality of the photographs
for purposes of identifying hair color are insufficient to render
the photo array impermissibly suggestive.

Even if a difference in hair color were to be found
impermissibly suggestive, this is not one of those "extraordinary
cases" in which the identification was so unreliable that there
is "a very substantial likelihood of irreparable
misidentification" warranting the exclusion of evidence.  *See*

*United States v. Henderson*, 320 F.3d at 92, 100 (1st Cir. 2003)

(citation omitted).

The Supreme Court has stated that "reliability is the

linchpin in determining the admissibility of identification

testimony." *Manson*, 432 U.S. at 114.  In determining whether the

photo array was reliable, I must consider five factors:

> (1) the opportunity of the witness to view the criminal
> at the time of the crime; (2) the witness' degree of
> attention to the crime; (3) the accuracy of the
> witness' prior description of the defendant' (4) the
> level of certainty demonstrated by the witness at the
> confrontation; and (5) the length of time between the
> crime and the confrontation.

*Henderson*, 32 F.3d at 100 (citing *Neil v. Biggers*, 409 U.S. 188,

199-200 (1972)).  After carefully considering these factors in

light of the circumstances of this case, I am convinced that

Frank's identification of Chan was reliable.

Chan asserts that Frank's identification was unreliable

because Frank had only met Chan three times and those meetings

took place more than a year before the date of identification.

However, Frank's co-conspiratorial relationship with Chan

presented ample opportunity for Frank to observe and remember

Chan's appearance.  The three meetings did not take place under

duress and were part of a business transaction of monetary

significance that spanned more than a year.  *See id.* (noting the

informant-buyer had multiple opportunities to observe the suspect

because "[t]his was not a single event crime").  Frank,

therefore, had both an opportunity and an incentive to pay close attention to Chan's appearance and to remember his face.

For the same reasons, the year-long delay between the last in-person meeting between Chan and Frank and the photo identification is not as significant as it would be for identifications based on a brief encounter with the suspect. *See United States v. Drougas*, 748 F.2d 8, 28 (1st Cir. 1984) (recognizing that although a five-year gap "is very much greater than would ordinarily be permissible[,] . . . unlike most cases involving suggestive identification challenges, the witness [here was a co-conspirator and] was not identifying an assailant . . . he viewed only once under stressful circumstances"); *see also United States v. Rodriguez-Pena*, 54 F.3d 764, 1995 WL 275691, at *9 (1st Cir. May 11, 1995) (unpublished table opinion). Moreover, Frank demonstrated a high level of certainty in his identification.  When presented with the photo array and asked whether he recognized any of the men pictured, Frank did not hesitate to identify Chan and his role in the conspiracy. (Goldsworthy Aff. ¶ 7.)

Accordingly, I am satisfied that Frank's identification of Chan from the photo array was reliable and will deny Chan's motion to suppress the pretrial identification.

### III. MOTION TO SUPPRESS 2003 STATEMENTS

Chan argues that the visit to Jetpower by Sonderman,

Estrada, and Ly on October 20, 2003, constitutes an illegal search of Jetpower and that Chan's statements to the agents were involuntarily given and elicited in violation of his Fifth Amendment rights.  Therefore, he argues, any statements made during the agents' visit or any observations that they made while at Jetpower's office must be excluded.  Chan further contends that any statements made by Jetpower's employees during the agents' second visit to Jetpower's office must be suppressed because they are tainted by the unlawful search of Jetpower and interrogation of Chan on October 20, 2003.  Chan also seems to argue that any information regarding his bank accounts must be suppressed because it is tainted by his involuntary statements regarding his bank account during the October 20 meeting.

A.   The "Search" of Jetpower

The "search" alluded to by Chan seems to encompass observations that Sonderman made regarding documents that he saw sitting on top of desks.  Sonderman made these observations after Chan invited the agents to sit down and as Chan led them from the reception area to the conference room.  (Chan Aff. ¶ 8; Sonderman Aff. ¶ 12.)  These items were open and in plain view and Sonderman did not move other objects to see them and did not handle the objects personally.  Chan does not aver otherwise. There is no evidence, therefore, of any "search" of Jetpower's office.  *See also United States v. Allen*, 573 F.3d 42, 51 (1st

13

Cir. 2009) (explaining the plain view exception to the warrant requirement of the Fourth Amendment).

Moreover, to the extent that it could be said there was a search of Jetpower by the U.S. agents, the Fourth Amendment's protections do not apply.  Both the Supreme Court and the First Circuit have unequivocally stated that the Fourth Amendment does not apply to searches or seizures of aliens that take place on foreign territory.  *See United States v. Verdugo-Urquídez*, 494 U.S. 259, 267 (1990) ("There is . . . no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters."); *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) ("As we have said before, the Fourth Amendment does not apply to activities of the United States against aliens in international waters." (citation and internal quotation marks omitted)).

Like the defendants in *Verdugo-Urquídez* and *Vilches-Navarrete*, at the time of the 2003 visit, Chan was an alien, not residing in the United States, and the search of his office took place on foreign soil.  *Verdugo-Urquídez*, 494 U.S. at 274; *Vilches-Navarrete*, 523 F.3d at 13.  Consequently, with respect to any observations made by the agents while present at Jetpower's office either on October 20 or 29, 2003, "the Fourth Amendment has no application."  *Verdugo-Urquídez*, 494 U.S. at 275.

14

Accordingly, I will deny the motion to suppress any evidence arising from the purported search of Jetpower's office.

**B.   Chan's Statements**

Chan argues that he was intimidated by the three agents and was restrained because he felt that he could not ask them to leave, could not refuse to answer their questions, and could not leave the interview.[3]  (Chan Aff. ¶¶ 6-9.)  Consequently, he submits, the interview constituted a custodial and coercive interrogation and that, because he was not notified of his *Miranda* rights, any statements that he made were in violation of his Fifth Amendment privilege against self-incrimination.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Neither the Supreme Court nor the First Circuit has considered whether the Fifth Amendment's *Miranda* requirements apply to interrogations of aliens conducted by U.S. agents on foreign soil.  At least one federal appeals court has directly addressed this question and concluded that the privilege does

---

[3] Chan felt that he was under investigation because the men surrounded him when they entered Jetpower and because they asked pointed questions regarding Jetpower and other businesses.  (Chan Aff. ¶¶ 5, 10.)  He suggests that the agents used their physical size to intimidate him.  However, Sonderman is the same height as Chan, and Ly was shorter than Chan.  (Sonderman Aff. ¶ 14.)  Moreover, the agents' stature could hardly have intimidated Chan during the interview, when all four men were seated around the conference table with Chan closest to the door.  (Sonderman Aff. ¶ 13.)

apply.[4]  *See In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 199 (2d Cir. 2008) (noting that a violation of the Fifth Amendment's privilege against self-incrimination takes place when the unlawfully obtained statement is offered at trial, not at the point at which the statement was elicited, and, therefore, no foreign defendant "tried in the civilian courts of the United States can be compelled to be a witness against himself"); *see also United States v. Heller*, 625 F.3d 594, 599 (5th Cir. 1980) (Kravitch, J.) (noting that "if American officials participated in the foreign search or interrogation, or if the foreign authorities were acting as agents for their American counterparts, the exclusionary rule should be invoked").[5]  However, other circuits have held that "non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." *See, e.g.*, *Jifry*

_____

[4] Several circuits have addressed interrogations of *U.S. citizens* abroad by U.S. agents and have found that those statements are entitled to the Fifth Amendment privilege.  *See, e.g.*, *United States v. Frank*, 599 F.3d 1221, 1228–29 (11th Cir. 2010) (following *United States v. Heller*, 625 F.3d 594, 596–98 (5th Cir. 1980)); *United States v. Abu Ali*, 528 F.3d 210, 227–28 (4th Cir. 2008) (Wilkinson, Motz, Traxler, JJ.) (following *Heller*).  These cases did not specifically address the question whether the nationality and/or residency of the person being questioned is determinative of whether the Fifth Amendment applies to interrogations conducted overseas.

[5] Chan relies upon *Heller*, but it appears that the defendant there was also a U.S. citizen.  *See Heller*, 625 F.3d at 596–98 (noting that Heller traveled to London and other locations in Europe from the United States and was detained by British officials following a tip by the U.S. Secret Service).

*v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *see also People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise."). It is therefore unclear whether the Fifth Amendment's privilege against self-incrimination attaches when U.S. agents question a foreign national and non-U.S. resident outside of U.S. territory. However, while I view the analysis in *In re Terrorist Bombings* as compelling, I need not reach that issue here in order to rule on the motion to suppress because Chan was not "in custody" and, therefore, the agents were not obligated to give him *Miranda* warnings.

A person questioned by law enforcement officials after being "taken into custody or otherwise deprived of his freedom of action in any significant way" is entitled to receive *Miranda* warnings. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*per curiam*) (quoting *Miranda*, 384 U.S. at 444). Consequently, "[s]tatements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Id.* However, this obligation attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.* (citation and quotation marks omitted). The First Circuit has held that, "[i]n determining whether a defendant was in 'custody' when interrogated, a court must examine all of the

circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on the freedom of movement of the degree associated with a formal arrest." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).  Because Chan was at no point formally arrested, I must determine whether his movements were so restrained as to rise to the level of placing him "in custody."

This inquiry is an objective one, and "the test is whether a reasonable person would believe [the person being questioned] is 'in custody' under the circumstances." *United States v. Pagán-Santini*, 451 F.3d 258, 263 (1st Cir. 2006) (citation omitted). The "subjective views harbored by either the interrogating officers or the person being questioned" are therefor irrelevant. *Stansbury*, 511 U.S. at 323.  Chan's purported fears that he was becoming the target of an investigation does not render him "in custody."  *See id.* at 326 ("Our cases make clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*."); *see also Pagán-Santini*, 451 F.3d at 263 (citation omitted) (finding that the fact that the person being questioned is or becomes the target of the investigation "alone would not entitle him to *Miranda* warnings").

18

Neither Chan nor Sonderman claim that the agents informed Chan that he was a suspect and, even if they had, that would not necessarily mean he was in custody for purposes of *Miranda*. *See id.*

The location and duration of the interview also indicate that Chan was not in custody.  Courts have found that questioning in a location familiar to the person questioned, such as his home or office, weighs against a finding of "in custody."  *See Nishnianidze*, 342 F.3d at 14 (noting that "Nishnianidze was interviewed at the place where he was staying[ and] was therefore familiar with the surroundings"); *United States v. James*, 113 F.3d 721, 727 (7th Cir. 1997) (finding interview by officers "in [defendant's] own office" and during business hours was not coercive).  Furthermore, the thirty-minute interview was "not exceptionally long" and, in light of the case law, could be considered quite short.  *Nishnianidze*, 342 F.3d at 14 (finding a forty-five minute interview not to be long); *cf. Pagán-Santini*, 451 F.3d at 263 (finding a nine-hour interview not to constitute custody).

Chan was never physically restrained nor detained in any way.  *He* invited the agents into the conference room, and *he* closed the door to that room.  None of the agents were carrying weapons, and Chan sat closest to the door to the conference room. *See Nishnianidze*, 342 F.3d at 14 (noting that the agents "did not

19

make physical contact with Nishnianidze or restrain his movement"). That Chan felt comfortable not answering the agents questions is demonstrated by the fact that he actually refused to answer many of the agents questions regarding Jetpower's participation in transactions involving aircraft parts and regarding the business actions of other companies using Jetpower's business address. Moreover, Chan himself ended the interview by promising to follow up with the agents. Such actions demonstrate that Chan felt free to decline to answer the agents' questions and to leave the interview. He was, plainly, not in custody for purposes of *Miranda*, and the agents were not obligated to notify him of his *Miranda* rights.

Chan also argues that the agents' questions created a coercive environment such that his statements were not voluntarily given. The government has the burden to prove by a preponderance of the evidence that his statements were voluntarily given, *United States v. Vanvliet*, 542 F.3d 259, 264 (1st Cir. 2008), but Chan has not adduced sufficient evidence to make the question an issue of fact. There are certain circumstances in which "noncustodial interrogation might possibly . . ., by virtue of some special circumstances, be characterized as one where the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." *United States v.*

20

*Beckwith*, 425 U.S. 341, 347–48 (1976) (citation and internal quotation marks omitted).  However, "only confessions procured by *coercive official tactics* should be excluded as involuntary." *United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002) (citation omitted) (emphasis added).

There is no evidence in the record that anything even approaching "police overreaching" or "coercive official tactics" occurred here.  *Id.* (quoting *United States v. Connelly*, 479 U.S. 157, 170 (1986)).  Sonderman, Estrada, and Ly asked questions regarding Chan's business — Jetpower — and transactions related to businesses using Jetpower's address.  He was not threatened physically or verbally, he was not deceived, and the agents left at Chan's prompting.  I am satisfied that the interview was not coercive and that Chan's statements were given voluntarily, given that no evidence has been offered that would suggest the contrary.

I find that Chan's statements during the interviews were made voluntarily and in a non-custodial setting not requiring *Miranda* warnings.  Furthermore, because Chan's statements were not elicited in violation of his Fifth Amendment rights, there is no occasion to address Chan's argument that the statements made during the October 29, 2003, visit and bank account information discovered subsequent to the 2003 visits are excludable fruit of the poisonous tree.  Accordingly, I will deny the motion to

suppress these statements and any observations made by the agents during their visits to Jetpower's office.

### IV. MOTION FOR AN ORDER OF IMMUNITY FOR DEFENSE WITNESS

Chan has filed a motion seeking an order of immunity for a potential defense witness, Kelvin Ho.  Chan states that Ho was present at Chan's meeting with Frank and would offer testimony contradicting the only evidence that the government will present regarding Chan's knowledge of the illegality of the export of the indicators, that is, Frank's testimony.

Although a court may not grant immunity to a defense witness under the use immunity statute, 18 U.S.C. § 6003(b), in very limited circumstances, a court may "require a grant of immunity if the defendants' constitutional rights were being violated by the government's refusal to provide immunity."  *United States v. Angiulo*, 897 F.2d 1169, 1190 (1st Cir. 1990); *see also United States v. Castro*, 129 F.3d 226, 232 (1st Cir. 1997) ("[T]he power to direct witness immunity customarily is reserved to the Executive Branch . . . ."); *United States v. Mackey*, 117 F.3d 24, 27 (1st Cir. 1997) ("The power to confer witness immunity under the statute has been given to the prosecutor, not the judge.").  Chan seeks an order of immunization under the prosecutorial misconduct theory of immunity, which "draws its essence from the Fourteenth Amendment right to due process."  *Curtis v. Duval*, 124 F.3d 1, 9 (1st Cir. 1997).  Immunity under this theory is only

22

available in "rare" and "extreme" cases.  *See, e.g.*, *Castro*, 129
F.3d at 232 (noting that such cases are "rare"); *Mackey*, 117 F.3d
at 27 ("[I]n certain extreme cases of prosecutorial misconduct,
the government's refusal to grant immunity could justify a
court's refusal to allow the prosecution to proceed.").  Chan's
case is neither rare nor extreme in this respect.

According to the prosecutorial misconduct theory, "'the due
process clause [constrains] the prosecutor to a certain extent in
her decision to grant or not to grant immunity.'" *Curtis*, 124
F.3d at 9 (quoting *Angiulo*, 897 F.2d at 1191) (alteration in
original).  The constraint "operates at the margins of the
prosecutor's discretion and takes on a practical significance
only when the prosecutor deliberately aspires to distort the
factfinding process." *Id.* (citing *Angiulo*, 897 F.2d at 1191).
Courts have recognized two ways in which a defendant can
demonstrate this intentional distortion: "[1] by showing an
attempt to harass or intimidate potential witnesses, or [2] by
showing that the prosecutor deliberately withheld immunity for
the purpose of hiding exculpatory evidence from the jury." *Id.*
Only the second means is at issue in this case.[6]

Chan argues that the government has offered no good faith
reason to refuse immunity for Ho and that withholding Ho's

---

[6] Both Chan and the government agree that the "effective
defense" theory, is unavailable in the First Circuit.  *See United
States v. Castro*, 129 F.3d 226, 232 (1st Cir. 1997).

testimony would violate Chan's right to present a defense.  Chan
maintains that Ho is the only witness who can contradict Frank's
uncorroborated testimony regarding Chan's knowledge of
illegality.[7]  Chan underestimates the showing that he must make
in order to demonstrate that an order of immunity is warranted
under the prosecutorial misconduct theory.  More particularly,
Chan has pointed to no evidence in the record that indicates that
the government has declined to seek immunity in bad faith or that
"the government's conduct was motivated by something other than
the sole desire to keep [the witness's] exculpatory testimony
from the jury."  *Angiulo*, 897 F.2d at 1193.

        The government has provided "perfectly plausible" reasons
for refusing to seek immunity for Ho.  *See Castro*, 129 F.3d at
233.  The government states that it does not want to seek
immunity in this case because it remains interested in
prosecuting Ho in connection with this matter and because Ho is
the subject of other, ongoing investigations that may lead to the
prosecution of Ho and others in the future.  The government
states that it tried to identify Ho in 2008 so that he could be
charged in the indictment along with Chan but could not do so
because his legal identity remains unknown.  Chan has not

---

        [7] I note that the government contends to the contrary that
it has discovered inculpatory emails on Frank's computer that can
corroborate Frank's testimony as to Chan's knowledge of the
illegality of the exports.

24

provided any identifying information beyond Ho's common name, Kelvin Ho, and that he worked for Chan.  Following inquiries from the government, officials in Singapore and Interpol in Malaysia failed to identify or locate a Kelvin Ho.

The concern that immunity might interfere with future prosecutions "has been a constant theme in the circuit court opinions" regarding motions of this kind.  *Mackey*, 117 F.3d at 27.  It is generally not the place of courts to weigh the government's interest in future prosecution against the defendant's interest in obtaining the witness's testimony.  *See id.* ("[M]ost courts have been unwilling to engage in such a weighing of respective interests, just as they decline to weigh risk against need when a witness colorably asserts his Fifth Amendment privilege. Such an evaluation would be especially cumbersome where, as here, the subject is largely within the expertise of the prosecutor." (citation omitted)).

I will not attempt such balancing here.  The reasons offered by the government are legitimate and compelling and I am satisfied that they "adequately deflect[] any insinuation that the government's handling of [the witness] . . . was motivated by the sole purpose of keeping exculpatory evidence from the jury." *Castro*, 129 F.3d at 233 (finding the prosecutor's desire not to impede state or federal charges that could still be brought against the witness to be sufficient to demonstrate a good faith

basis).  Similarly, as in *Angiulo*, Chan failed to "establish the requisite causal nexus between the government's conduct and [the witness's] decision not to testify" without immunity.  897 F.2d at 1193 (citing *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir. 1987)).  There is no evidence that the government decided not to charge Ho with Chan and the other co-conspirators *in order to* withhold his testimony from the jury.  In fact, the government maintains that it would charge him if it could identify him for charging and extradition.  This is not a case of extreme prosecutorial misconduct, and consequently I will deny the motion for an order for immunity.

### V. CONCLUSION

For the foregoing reasons, Chan's motions to suppress evidence of Frank's pretrial identification (Docket No. 24), to suppress statements and observations made during the October 2003 visits by OEE agents (Docket No. 26), and for defense witness immunity (Docket No. 58) are DENIED.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE